CHICAGO, M. & ST. P. RY. CO. v. VOELKER.

(Circuit Court of Appeals, Eighth Circuit. March 26, 1904.)

No. 1,842.

1. RAILROADS—AUTOMATIC COUPLERS—STATUTES—CONSTRUCTION.

Act March 2, 1893, c. 196, 27 Stat. 531 [3 U. S. Comp. St. 1901, p. 3174], provides that after January 1, 1898, it shall be unlawful for any common carrier, engaged in interstate commerce by railroad, to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers "coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." Code Iowa 1897, §§ 2097, 2080, declares that after the same date no corporation operating a railroad shall have upon such railroad in that state any car that is not equipped with "automatic couplers so constructed as to enable any person to couple or uncouple them without going between them." Held, that the test to be applied by both of said acts, viz., whether the person operating the coupler is required to go between the ends of the cars, applies to the act of coupling as well as that of uncoupling, and that the act of Congress forbids the use of a coupler which requires the operator to go between the ends of the cars to prepare the coupler for the impact.

2. ACT OF COUPLING CARS.

The preparation of the coupler for the impact is not distinct from the act of coupling. The preparation and the impact are connected and indispensable parts of the larger act, which is regulated by the statute, and the performance of which is intended to be relieved from unnecessary risk and danger.

3. STATUTES—CONSTRUCTION.

Statutes, the purpose of which is the protection of the lives and limbs of men, are so construed as to prevent the mischief and advance the remedy, so far as the words fairly permit.

4. STATUTES—INTERPRETATION.

Punctuation is a minor, and not a controlling, element in interpretation, and courts will disregard the punctuation of a statute, or repunctuate it, if need be, to give effect to what otherwise appears to be its purpose and true meaning.

5. DEFECTIVE CAR COUPLERS—ACTIONABLE NEGLIGENCE.

Where an automatic car coupler had been permitted to become and remain defective so that the lever would not lift the pin from the socket and the knuckle could not be drawn open by leaning toward the coupler and using one hand, but required the presence of the operator's entire body between the ends of the cars and between the drawbars, and the use of both of his hands, such coupler did not satisfy Act March 2, 1893, c. 196, 27 Stat. 531 [3 U. S. Comp. St. 1901, p. 3174], or Code Iowa 1897, §§ 2097, 2080, requiring the use of automatic car couplers not requir-

ing the presence of any person between the ends of the cars in order to operate the same; and the use of such defective coupler constituted actionable negligence.

**6. INTERSTATE TRAFFIC—TEMPORARY SUSPENSION OF TRANSIT.**

A shipment, originating in one state and being moved to a point in another state, is impressed with the character of interstate traffic, which will follow the shipment until the actual transit ceases. A car used in moving such shipment remains subject to Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], until its use in moving the shipment is ended, notwithstanding the transit may be temporarily, but not indefinitely, suspended; and this, whether the ultimate destination of the shipment be near to or remote from the point of suspension.

**7. PETITION—OBJECTIONS AT TRIAL—VARIANCE—APPEAL.**

Where, in an action for wrongful death of a switchman by reason of an alleged defective coupler attached to a car used in moving traffic, defendant offered no objection to evidence which, without conflict, established the interstate character of the commerce in which defendant was engaged and of the traffic being moved by the car in question, and in excepting to the instructions applying Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], to the case, defendant did not place its exceptions on the ground that the petition did not state a case arising within interstate commerce, such objection was not available on appeal.

**8. AUTOMATIC COUPLERS—WHERE DEFECTIVE NO ASSUMPTION OF RISK.**

Under Act Cong. March 2, 1893, c. 196, § 8, 27 Stat. 532 [3 U. S. Comp. St. 1901, p. 3176] providing that any employé of an interstate carrier who may be injured by any car in use contrary to the provisions requiring the use of automatic couplers shall not be deemed thereby to have assumed the risk, though he continue in the employment of such carrier after the unlawful use of such car, etc., has been brought to his knowledge, a switchman engaged in handling a freight car having a defective coupler, on a track principally used for handling freight trains, though sometimes used to handle cars in need of repairs, did not assume the risk arising from the defect in the coupler; the car not having been marked or isolated as one in bad repair, and its movement at the time not being with a view to its isolation or repair.

**9. CONCURRING ACTS OF NEGLIGENCE—INSTRUCTIONS.**

Where a right of recovery was rested upon each of two separate and concurring acts of negligence, it was the right of each party to have the jury correctly instructed respecting each act of negligence, the same as if the right of recovery rested upon it alone; and, if there was material error in the instructions given or refused respecting either charge of negligence, the verdict, where general, cannot stand.

**10. CUSTOM TO KICK CARS WITHOUT NOTICE TO FIELDMAN—ASSUMPTION OF RISK.**

Where it was the general and uniform custom in a railroad yard to kick cars down to a fieldman without giving him notice or warning, a fieldman who was aware of such custom and remained in that service assumed the risk of injury arising from the observance of the custom.

In Error to the Circuit Court of the United States for the Northern District of Iowa.

For opinion below, see 116 Fed. 867.

This was an action to recover damages for the death of Emil Voelker, occurring while he was engaged in coupling cars at Dubuque, Iowa, in the service of the railway company. After describing defendant company as a Wisconsin corporation "engaged in operating a line of railway through the

---

¶ 8. Assumption of risks incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.

¶ 10. See Master and Servant, vol. 34, Cent. Dig. § 596.

state of Iowa," and having upon one of its yard tracks at Dubuque "a loaded car, which was to form a part of a train then being made up * * * for early movement," and after describing Voelker as a car coupler and fieldman in the switching crew which was making up this train, the petition charged two acts of negligence on the part of the company as proximate causes of Voelker's death: (1) "Defendant negligently permitted the coupler on the northerly end of said car to become and remain inoperative and defective in that the link connecting the lever and the pin was loose, broken, and disconnected, so that the pin and coupler could not be operated by means of the lever, and the said coupler was so old, worn, and rickety that the pin could not be raised because of the tumbler pressing and resting against the frame of the coupler, thus making it necessary, in order to operate the coupler, to go between the cars, insert the hand in the coupler, push the tumbler away from the frame, and then raise the tumbler and pull the knuckle open. * * * Defendant knew, or by the exercise of ordinary diligence could and should have known, of the defective and inoperative condition of the coupler aforesaid, before the death of said Voelker, and in time to have remedied the same." (2) "The general practice recognized and known by defendant, then and many years prior thereto in force, was for car couplers to go between the cars and open the knuckles whenever the same could not be operated by means of the lever." Voelker accordingly went between this and another car, which were separated a few feet, "to open the knuckle, in order that the coupling might be made by impact; and while thus engaged, and unaware of the danger to which he was exposed, said switching crew, while acting within the scope of their employment, and knowing that said Emil Voelker went between said cars to couple the same, negligently caused two or more other cars to be kicked with great force * * * against the cars between which said Emil Voelker was thus occupied, * * * without signal from him, although the general practice then and long prior thereto required that said cars be not moved while he was thus occupied between the cars, without signal from him."

Defendant's answer denied the statements of the petition other than those relating to the citizenship of the parties, charged that Voelker's death was the result of his own contributory negligence, and alleged that the track where he was injured was prior to and all during his service used to set out and handle thereon cars having some defect in them and needing repairs, as well as other cars not defective; that this was known to him, or could have been ascertained by the exercise of ordinary care; that with this knowledge or means of knowledge he remained in the company's service, and continued to work on that track without objection or complaint, and therefore assumed the risk of meeting and working with defective cars at that place.

At the trial these facts were established: The car in question was loaded with coal, and was brought by defendant over its line of railroad from a station thereon in the state of Illinois, and reached defendant's yards at Dubuque, Iowa, about 5 o'clock in the afternoon. About 8 o'clock the next morning, when the injury to Voelker occurred, the car was on a freight track principally, or largely used in receiving incoming freight trains and making up outgoing freight trains. A switching crew, in which Voelker was acting as car coupler and fieldman, was then engaged in shifting about and coupling this coal car and several other loaded cars. While Voelker was between the coal car and another car separated by a distance of about 10 feet, and was engaged in adjusting the coupler on the coal car so that it would couple automatically upon impact, the two cars came together, catching him between the drawbars, and crushed him to death. He was 29 years old, and had been in defendant's service as brakeman and switchman 8 years. In respect of several other matters the evidence was conflicting. The jury returned a verdict for plaintiff, on which judgment was rendered, to reverse which the railroad company prosecutes this writ of error.

W. J. Knight and H. H. Field, for plaintiff in error.

H. C. Kenline and J. J. McCarthy (R. P. Roedell, on the brief), for defendant in error.

George Crane, Asst. U. S. Atty., amicus curiæ.

Before SANBORN, THAYER, and VAN DEVANTER, Circuit Judges.

VAN DEVANTER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is entirely clear that the trial proceeded upon the theory that plaintiff's petition charged two acts of negligence on the part of the railway company as proximate causes of Voelker's death: First, permitting the coupler upon the coal car to become inoperative and defective; and, second, kicking or sending other cars against the cars between which Voelker was engaged without a signal from him, and contrary to a general and established practice. Each party, without objection from the other, introduced evidence bearing directly upon each charge of negligence, and not otherwise relevant to the issues. The court also instructed the jury upon this theory. The contention on behalf of the railway company that the case was tried upon the theory that the petition charged the negligent kicking or sending of other cars against those between which Voelker was engaged as the sole proximate cause of the injury is not supported by the record, but is refuted by it. The evidence relating to the condition of the coupler on the coal car was conflicting, but substantial evidence was produced by plaintiff to the effect that it was equipped with a coupler known as "Hein No. 1," which originally, and when in good condition, could be prepared for coupling and would couple automatically by impact, without the necessity of any one going between the ends of the cars in the sense of putting the body entirely between them, but that at the time of the injury to Voelker this coupler had become so defective and inoperative that when the knuckle thereof was closed it was necessary for some one to go completely between the cars to open it, and thereby prepare the coupler for the impact; that this condition of the coupler had existed for such a length of time as to charge the railway company with notice; and that at the time of the injury the knuckle was closed, and, in the discharge of his duty as a switchman, Voelker was entirely between the ends of the cars engaged in preparing the coupler for the impact by opening the knuckle, a task made difficult by the defective and inoperative condition of the coupler. In view of this evidence, and the established facts shown in the statement before made, the court, in substance, said to the jury that it would be assumed that they would find from the evidence that defendant was a common carrier engaged in interstate commerce by railroad, and that the coal car was being used by defendant on its line of railroad in moving interstate traffic, and then instructed them that the branch of the case resting upon the condition of the coupler was controlled by the act of Congress of March 2, 1893, c. 196, 27 Stat. 531, 3 U. S. Comp. St. 1901, p. 3174, relating to safety appliances to be provided and maintained by such common carriers. This is assigned as error, and in support of the assignment it is urged: First. That the act of Congress does not forbid the use of a car having an automatic coupler "to prepare which for the impact" it is necessary to go between the ends of the cars, but is satisfied with a coupler which, when so prepared, will couple automatically by impact; that

the terms of the congressional act are such "that the test of a man going between the ends of the cars is applied to uncoupling only, and that no such test is applied to coupling"; and that plaintiff's petition and the evidence show Voelker "was not attempting to make a coupling," but was simply opening the knuckle of the coupler, the defect in which, if it were defective, did not prevent it from coupling automatically by impact when open, but merely rendered it more difficult to open the knuckle or prepare the coupler for the impact. Second. That there is no evidence but that the car had reached its destination, or that it was intended to be thereafter used in moving interstate traffic. And, third, that plaintiff's petition does not allege that defendant was a common carrier engaged in interstate commerce by railroad, or that the coal car was being used on defendant's line of railroad in moving interstate traffic, and therefore does not state a case controlled by the act of Congress.

The first section of. the safety appliance act of Congress of March 2, 1893, requires "every common carrier engaged in interstate commerce by railroad" to equip its engines and trains used in moving interstate traffic with a system of train brakes which will enable the engineer to control the speed of the train. The second section declares:

"That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

A statute of Iowa enacted April 6, 1892 (sections 2097, 2080, Code 1897), declares:

"After January 1, 1898, no corporation, company or person, operating a railroad, or any transportation company using or leasing cars, shall have upon such railroad in this state any car that is not equipped with such safety automatic coupler," namely: "with automatic couplers so constructed as to enable any person to couple or uncouple them without going between them."

While there is some difference in the words by which these statutes describe the type of coupler with which each requires cars coming within its operation to be equipped, we think both apply the test of whether the person operating the coupler is required to go between the ends of the cars to the act of coupling as well as to that of uncoupling. The risks and dangers which attended the old link and pin system when couplings and uncouplings were effected by going between the cars were such a menace to the lives and limbs of those employed in that branch of the railroad service, and these risks and dangers inhered so largely in the act of going between the cars, whether in the act of coupling or uncoupling, that there can be no doubt of the purpose of the congressional enactment as well as of that of the state to obviate and prevent this act of exposure, which the invention and use of automatic couplers had demonstrated to be wholly, or at least largely, unnecessary. The state statute plainly and without uncertainty calls for "automatic couplers so constructed as to enable any person to couple or uncouple them without going between them." If there be uncertainty in the congressional act, it is obviated by merely inserting a comma after the word "uncoupled" in that portion of the act which

calls for "couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." The concluding phrase then literally applies to both the coupling and uncoupling. Punctuation is a minor, and not a controlling, element in interpretation, and courts will disregard the punctuation of a statute, or re-punctuate it, if need be, to give effect to what otherwise appears to be its purpose and true meaning. Hammock v. Loan & Trust Co., 105 U. S. 77, 84, 26 L. Ed. 1111; United States v. Lacher, 134 U. S. 624, 628, 10 Sup. Ct. 625, 33 L. Ed. 1080; United States v. Oregon, etc., Railroad, 164 U. S. 526, 541, 17 Sup. Ct. 165, 41 L. Ed. 541; Ford v. Delta, etc., Co., 164 U. S. 662, 674, 17 Sup. Ct. 230, 41 L. Ed. 590; Stephens v. Cherokee Nation, 174 U. S. 445, 480, 19 Sup. Ct. 722, 43 L. Ed. 1041; Sutherland, Statutory Construction, § 232. Obviously, the purpose of this statute is the protection of the lives and limbs of men, and such statutes, when the words fairly permit, are so construed as to prevent the mischief and advance the remedy. The mischief to be prevented rested quite as much in the act of coupling as in the act of uncoupling. Science had offered, and practical use had approved, a remedy applicable not alone to the act of uncoupling, but also to that of coupling. The two statutes, federal and state, seem to have been enacted in pursuance of a common purpose to afford a remedy as broad as the mischief, and to remove the source or cause of the latter through the compulsory adoption and use of a new system of coupling and uncoupling which dispensed with the necessity of any one going between, or at least entirely between, the cars.

The contention that the preparation of the coupler for the impact is distinct from the act of coupling is a mistaken attempt to separate a part of an act from the whole. The preparation of the coupler and the impact are not isolated acts, but connected and indispensable parts of the larger act, which is regulated by these statutes, and the performance of which is intended to be relieved of unnecessary risk and danger.

Counsel for the railroad company deny, and opposing counsel affirm, the existence at the time of the enactment of this legislation of any automatic coupler which could be prepared for the impact or coupling by manipulating a lever or otherwise, without placing any portion of the body between the ends of the cars. The real situation then existing, if shown by evidence produced at the trial, or by something of which judicial notice could be taken, might have an important bearing upon the true meaning of these statutes in respect of the extent to which it was intended to dispense with the necessity of going between the cars; but no evidence upon this point was presented by either party, and counsel have not attempted to call our attention to anything which sustains either of their opposing assertions. An examination of public documents, possibly within the range of judicial notice, tends to confirm the assertion of counsel for plaintiff that such couplers were in existence and in actual use at that time, but we think a determination of this question is not necessary to a decision of this case. There is no doubt under the evidence but that this "Hein No. 1" coupler, when in reasonably good condition, is operated in

this manner: The switchman, by depressing with one hand a lever at the corner of the car, lifts the pin from the socket in the coupler, and, leaning toward the coupler, readily draws the knuckle open with the other hand, an act which is performed in a brief space of time, with slight exertion, and without placing the body completely between the ends of the cars. Plaintiff's petition complains, not of the type of coupler with which this car was equipped, but that defendant negligently permitted it to become and remain so defective and out of repair that it could not be operated in the usual manner; that the pin could not be lifted by means of the lever; and that it was necessary "to go between the cars, insert the hand in the coupler, push the tumbler away from the frame, and then raise the tumbler and pull the knuckle open." In their brief, counsel for plaintiff concede that, if the coupler is operative and in good condition, "this is a reasonably safe method of making the coupling," and that whether this coupler, when in such condition, fully conforms to the congressional or state statute "is not a vital question in this case." For the present purposes it will therefore be assumed—a decision upon the question being unnecessary—that this coupler, if in reasonably good condition, satisfied both statutes. But the evidence produced by plaintiff tended to show that the coupler was not in reasonably good condition; that it had been permitted to become and remain defective and inoperative; that the lever would not lift the pin from the socket; that the knuckle could not be drawn open by leaning toward the coupler and using one hand, but to open it required the presence between the ends of the cars, and between the drawbars, of the entire body of the person attempting it, and also the use of both hands, considerable strength, and more than the usual time; all of which greatly increased the risk and added to the danger of the undertaking. If this was the true condition of the coupler at the time of the injury, it did not satisfy either statute, and its use was violative of one or the other of them, and constituted actionable negligence.

Whether the violation was of the congressional act or of the state statute depended upon whether defendant was a common carrier engaged in interstate commerce by railroad, and was using the car in question on its line of railroad in moving interstate traffic. We think there was evidence that the carriage or movement of the coal with which the car in question was loaded had not terminated, and that the coal was still actually in transit. The evidence contains no suggestion that the car had reached the end of its journey, or that it was to remain indefinitely or for any considerable time on the track where it was at the time of the injury, or that the coal was to be unloaded there. The inference to be reasonably drawn from the evidence is that the car was then about to actively continue the journey toward the ultimate destination of the coal which it was carrying. Whether that was near by or remote is not material, because the shipment had originated in another state, and was already impressed with the character of interstate traffic, which would follow it at least until the actual transit ceased. Defendant was clearly shown to be a common carrier engaged in interstate commerce by railroad, and to be using the car mentioned on its line of railroad in moving interstate traffic,

and therefore the branch of the case relating to the condition of the coupler is controlled by the act of Congress, and not by the state statute. Plaintiff's petition states clearly enough that defendant was a common carrier engaged in commerce by railroad, and that it was using this car on its line of railroad in moving traffic. As stated, the case falls short of coming within the act of Congress only in that the petition does not allege the interstate character of the commerce in which defendant was engaged, or of the traffic which the car was moving. But, whether the case stated is controlled by the act of Congress or the state statute, it is one of actionable negligence, the right and measure of recovery for which are the same in either event, and are to be ascertained and enforced by the same rules. Other allegations bring the case equally within the jurisdiction of the Circuit Court, whether the violation was of one statute or of the other. Defendant offered no objection to the evidence, which without conflict established, as before shown, the interstate character of the commerce in which defendant was engaged, and of the traffic being moved by the car mentioned; nor does it appear that in excepting to the instructions by which the court applied the act of Congress to this branch of the case, defendant put its exception upon the ground that the petition did not state a case arising in interstate commerce. Plaintiff was entitled to be seasonably apprised of the objection if it were intended to be relied upon, and doubtless the court would have permitted an amendment of the petition, as it is manifest the defendant was not misled or surprised by the variance. Under the circumstances the petition may well be considered as having been amended to conform to the facts proved. Code Iowa 1897, §§ 3597, 3600; Rev. St. U. S. § 954 [U. S. Comp. St. 1901, p. 696]; Roberts v. Graham, 6 Wall. 578, 581, 18 L. Ed. 791; Nashua Savings Bank v. Anglo-American, etc., Co., 189 U. S. 221, 231, 23 Sup. Ct. 517, 47 L. Ed. 782; Haley v. Kilpatrick, 44 C. C. A. 102, 104, 104 Fed. 647. We are of opinion that no error was committed in instructing the jury that the branch of the case resting upon the condition of the coupler was controlled by the act of Congress.

It is assigned as error that the court, in effect, instructed the jury to disregard the defense of assumption of risk based upon the allegation, in defendant's answer, that the track on which the coal car was standing was used "to set out and handle thereon * * * cars having some defect in them and needing repairs, as well as other cars not defective," and that this was known to Voelker, or could have been ascertained by him by the exercise of ordinary care. The allegation is not that this was a hospital track, specially designed or used for isolating or holding cars in need of repair or for repairing them, or that the car in question was being moved with a view to its isolation or repair. Section 8 of the controlling act of Congress declares:

"That any employee of any such common carrier who may be injured by any locomotive, car, or train in use contrary to the provision of this act shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge."

The evidence, without any substantial conflict, showed that this track was principally used in actively handling freight trains and freight cars; that incoming trains were received thereon and the cars distributed therefrom; that outgoing trains were made up thereon and dispatched therefrom; that incoming trains sometimes brought thereon cars in need of repair, and in some instances such cars were temporarily transferred thereto from other tracks; that there was in the yards at Dubuque a hospital track specially designed and used for isolating and holding cars in need of repair; that the practice was to inspect the cars of incoming trains, and to mark those found in need of repair, commonly termed "bad order" cars, in such manner as to indicate their condition, preparatory to their proper disposition, and as a warning to those handling them; and that at the time of the injury this car had not been marked or isolated as in bad order. There was no evidence that Voelker was engaged in moving the car as one in bad order, with a view to its isolation or repair. Of this evidence it is sufficient to say that, working under such circumstances with a car in use contrary to the congressional act does not, in the presence of section 8, amount to an assumption of the risk arising therefrom, and the court very properly instructed the jury to that effect.

As shown in the statement before made, plaintiff's petition rested the right of recovery upon two acts of negligence on the part of defendant, and, as stated in the brief of counsel for plaintiff: "The case was tried to the jury upon the theory that the injury was the result of two concurring or proximate causes: (1) The defective and nonautomatic coupler; and (2) the negligent kicking down of the second cut of cars." It was therefore the right of each party to have the jury correctly instructed respecting each of the claimed acts of negligence the same as if the right of recovery rested upon it alone; and, if there was material error in the instructions given or refused respecting either charge of negligence, the verdict, being general, cannot stand.

The principal allegations constituting plaintiff's second charge of negligence were: First, the existence of a practice in defendant's yards at Dubuque, long recognized by defendant, and amounting to a general custom, requiring, when a car coupler, also called "fieldman," is engaged between two cars in preparing them for coupling, that other cars be not moved against those between which he is engaged without a signal from him; and, second, the kicking or sending of other cars forcibly against those between which Voelker was engaged, without a signal from him, and with knowledge of his exposed position between the cars. The evidence shows that the coal car before mentioned was standing on a freight track distant about 800 feet from a switch which connected it with the main track; that the switching crew, with an engine and 12 or 13 cars, approached the switch from along the main track, and there kicked 8 or 9 of the cars onto the freight track with sufficient force to send them along that track to or near the coal car; that Voelker accompanied the moving cars, riding thereon, for the purpose of controlling their speed and of effecting a coupling between them and the coal car; that the switching crew then kicked 2 of the remaining cars down the main track, then kicked the other 2 cars onto the freight track with sufficient

force to send them along that track to or near the cars first kicked thereon, and then followed the 2 cars sent down the main track. It was the theory of plaintiff's evidence that the cars last kicked onto the freight track moved along that track to the point reached by the cars first kicked thereon, and struck them with such force as to move them against the standing cars and cause the injury to Voelker, who was then between the cars, and engaged in opening the knuckle of the coupler on the coal car, as before stated. Whether the second set of cars actually reached those first sent along the freight track was, however, the subject of conflicting evidence, as was also Voelker's knowledge of the intention to send a second set of cars along that track. The switching crew did not know of Voelker's position between the cars, or that there was occasion for him to go between them. He gave no signal to the switching crew indicating that there was occasion for him to go between the cars, and no effort was made by them to apprise him of the approach of the second set of cars, excepting as it was claimed that he was informed, before leaving the switch, of the intended sending of a second set of cars along the freight track. While the switch and standing cars were widely separated, the view between them was unobstructed, so that Voelker and the switching crew could each have ascertained the movements of the other with little effort. It was important, therefore, to know whether it was Voelker's duty to take the precaution necessary to avoid injury from an exposed position between the cars and the movement of other cars, or whether it was the duty of the switching crew to take this precaution. While the evidence respecting the practice in switching cars and the duties to be performed by those engaged therein was conflicting, that produced by defendant, including the testimony of the yardmaster and of the foreman of the switching crew under whom Voelker was employed, tended to show that the practice long established, generally followed, and effective during Voelker's employment, was that this duty rested upon the car coupler, and not upon the switching crew. The custom is stated by one of the witnesses in this manner:

"Where the cars are kicked onto a track, and a man rides down the first cut, and goes into the field, and other cars are kicked in on the same track, it is not customary or a usual thing for the men who are kicking the cars in to wait before kicking in a second cut, to see where the man is who rode the first cut down. It is not customary for persons kicking in cars in that way to hold up or refrain from kicking them in, after one set of cars is kicked in, until they can see the man in the front, unless they get a signal from him or something. The man who rides down the first string is called the 'fieldman,' and he is understood to take care of himself—look out for himself. These were automatic couplers on these cars. The fieldman sets the couplers so if they come together they will catch. When he goes in, and finds he can't couple, and he understands other cars may come down the track, his duty is to step out. He don't need to give any signal—step out of the way. He would give no signal to the men who were kicking in the cars on the other end, because it wouldn't be necessary. You couldn't stop the cars, kicking them in there. It don't make any difference for that coupling he would let it go. It would be coupled up afterwards."

Another witness put it this way:

"Q. It wouldn't be customary to be looking for that [position of fieldman]? A. No, sir. When we switch cars we always kick one cut in, and the field-

man looks out for them, and keeps on kicking until you get the track filled up. Q. And then you would kick in cut after cut without looking to the fieldman at all? A. Yes, sir. * * * Q. The fieldman, as I understand it, is supposed to look out for himself? A. Yes, sir. Q. By the Court: Is there a difference between the action when a switchman or fieldman is in for the purpose of coupling up the cars? A. If the fieldman ain't got all the couplings made, you get hold with your engine, and couple them all up."

As applicable to this state of the evidence bearing upon the second charge of negligence, defendant requested the court to charge the jury as follows:

"If, while Voelker was working in the yards, it was the general and uniform custom to kick cars down to the fieldman without giving him any notice or warning, and Voelker continued in the service, such custom being practiced or acted on, he took the risks arising from this manner of kicking cars, and no recovery can be had because of injury to him caused thereby."

"If, while Voelker was working in the yard, it was the general and uniform custom to kick cars down to a fieldman, so called, without giving him any notice or warning, and Voelker was acting as fieldman, and cars were kicked down to him without giving him notice or warning, and he remained working in the yard while this custom or practice was observed, there can be no recovery for any injury done him because of the kicking of cars to him without giving notice or warning that it was to be done."

The court refused to so instruct the jury, and gave no other instruction upon the subject. We regard these requests as substantially the same, and think one of them should have been granted. The rejection of both was error. Each is in terms carefully confined to the charge of negligence in kicking or sending down the second set of cars, and each requires that the custom should have been general and uniform, and that Voelker should have continued in the service while the custom was being observed. If it was general and uniform, and was observed during his continuance in the service, it was manifestly within not merely his means of knowledge, but his actual knowledge. He was an experienced railroad employé, and was familiar with this branch of that service, having been in defendant's employ as a brakeman and switchman for a period of eight years. He therefore understood the dangers incident to the observance of such a custom. There can be no claim, under the evidence, that the injury was willfully or wantonly inflicted. Nor was the custom an unreasonable one. Whether or not there was occasion to go between the cars, and thus assume a position of exposure to injury from the movement of other cars, would be known to the fieldman, but not to the switching crew. His position would also enable him to judge of the character and probable duration of the exposure better than could be done by others. He would be primarily in a place of safety, would know that the work in which he was engaged was, in a larger sense, that of moving cars and making up trains, and, being in control of his movements, would not assume a position of danger without some volition of his own. If, in the presence and during the observance of a general and uniform custom of the character stated, Voelker continued in the service of defendant, he assumed the risk of injury arising from its observance.

The judgment is reversed, with a direction to grant a new trial.