Mr. Justice Van Orsdel
delivered the opinion of the Court:
The chief proposition presented by this appeal is whether or not the Washington Terminal Company is a common carrier within the meaning of the employers’ liability act (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148). The acts of Congress of February 12, 1901 (31 Stat. at L. 774,. chap. 354), and February 28, 1903 (32 Stat. at L. 909, chap. 856), in general, required the Baltimore & Ohio Railroad Company and the Philadelphia, Baltimore, & Washington Railroad' Company, commonly known as the Pennsylvania Company, to eliminate the grade crossings in this city, and to construct a large and commodious union station to accommodate the passenger traffic into and out of the city of Washington.
By the act of 1901 the Baltimore & Ohio Railroad Company was permitted to organize the Washington Terminal Company, under the general railroad incorporation laws of the District of' Columbia, with a capital stock of $5,000,000 and to subscribe for all of the stock of the company. The terminal company was “authorized and empowered, from time to time, to take, acquire, and hold in fee simple, all lands and property required', for the terminals, stations, yards, railroad facilities, and other-works authorized by this act.”
The act of 1903 authorized the Philadelphia, Baltimore, & *388 Washington Railroad Company to acquire by purchase from the Baltimore & Ohio Railroad Company one half of the capital stock of the terminal company. The operating agreement between the terminal company and the various railroad companies entering the District of Columbia, hereafter referred to, show that this purchase was made. Prior to the organization of the Washington Terminal Company, the Baltimore & Ohio and the Philadelphia, Baltimore, & Washington Railroad Companies owned all the railroad lines within the District of Columbia. The other roads entering the District under contracts with these •companies used their tracks and stations. Since the organization of the terminal company, these two companies own all roads in the District, except those owned by the terminal company. It will therefore be observed that the two companies formerly owning the entire system of railroad lines within the District of Columbia became the owners of all the stock of the terminal company.
The act provides for the location of “the main passenger station and terminals for the accommodation of the passenger traffic of both the Baltimore & Ohio Railroad Company and the Philadelphia, Baltimore, & Washington Railroad Company, and the passenger traffic of such other companies as may be moved over the railroads of either of said two companies.” It further provides that the “terminal company is also expressly authorized and empowered, subject to the approval of the Commissioners of the District of Columbia, to acquire and become possessed of such lands in the District of Columbia, outside the city limits, as may be from time to time needed for the purpose, and thereon to construct, maintain, own, and operate yard tracks, switches, roundhouses, shops, and other structures to adequately accommodate the handling, shifting, housing, storing, cleaning, and repairing of the locomotives and cars of such. companies as shall be entitled to use the said passenger station and terminal; and also to establish, maintain, and operate the necessary tracks connecting the same with the tracks” of the terminal company.
The act also provides “that any railroad company now or *389 hereafter lawfully existing, and authorized to extend a line of railroad into the District of Columbia, or having secured the right to operate over the lines of any other then existing railroad, to a point of connection with the tracks of said terminal company, shall have the right to the joint use of said station and terminals upon the payment of a reasonable compensation for the use of the same; and if the parties be unable to agree upon such terms, then the same shall be prescribed by the supreme court of the District of Columbia, upon petition of either party in interest, under such rules of procedure as the said court shall prescribe.”
Pursuant to the authority vested in it, the Washington Terminal Company entered into a joint contract with the Baltimore & Ohio Railroad Company and the Philadelphia, Baltimore, & Washington Railroad Company, also with their tenant companies, the Southern Railway Company, the Chesapeake & Ohio Railway Company, and the Washington Southern Railway Company, whereby, for a stipulated consideration, each of said five companies is permitted to run its passenger trains over the tracks of the terminal company into- and out of its union station. The contract provides, among other things, that “the terminal company, through its superintendent or other proper officer appointed by it, shall maintain and operate the said railroad property, passenger terminal, and yard, * * * and have the control and supervision of all engines and employees connected therewith, and shall enforce such rules and regulations for the efficient operation and use thereof as may be necessary, * * * and the trains and employees of each of the parties hereto, while in or upon the said railroad and property, shall be subject to such rules and regulations (being the rules and regulations of the board of managers of the terminal company), and to the orders of the superintendent or other proper officer, of the terminal company. * * * All claims for loss and damage arising from or in connection with the administration, operation, and use of said railroad property, passenger terminal, and Eckington car and engine yard, * * * shall be *390 cared for, dealt with, adjusted, defended, or otherwise disposed of, by said terminal company.”
It appears from the record that the terminal company owns many miles of tracks and switches in the District of Columbia, over which all passenger traffic conducted by any steam railroad entering the District must pass; that it owns and operates what is known as the Eckington car and engine yards, with tracks, shops, tools, machinery, and roundhouses; that these yards are used for the housing and repairing of the engines and cars of the various companies using the lines of the terminal, company; that the outgoing trains are made up by the use of the switch engines of the terminal company; that the terminal company owns the union station, tracks, yards, and switch engines; that it maintains baggage, mechanical, way, and transportation departments; that it operates and controls the tracks, switches, and signals within its territory; that it employs all the men in and about the yards, station, roundhouses, shops, and upon the engines operated by it; that the movements of all trains and engines are controlled by its yard master, and a record thereof kept; that the baggage is handled by the terminal company; that the terminal company employs and controls all gatemen, baggagemen, ticket agents, ticket receivers, and porters, who have charge of all passengers from the time they become such until they enter the trains, and from the time they leave the trains until they leave the grounds of the company) and that all employees of any railroad company, while operating trains over the lines of the terminal company, are subject to the control and orders of the superintendent of the terminal company.
The Washington Terminal Company, by its incorporation under the powers conferred by the act of Congress, is vested with all the rights, powers, and privileges of a railroad company. By the act of Congress (32 Stat. at L. 909, chap. 856), it is given the power to contract with other lines of railroad entering the city, and such railroad companies are compelled to contract with the terminal company for the use of its lines in order to gain access to the union station. In order that this arrangement may *391 be perpetually assured, the act further prohibits the sale by the terminal company of its railroad or other property. In other words, its organization is based upon the necessity of concentrating the passenger traffic at one union station, under single management and control, at the same time assuring not only the railroads entering the District at the present time, but all that may hereafter enter, uniform facilities and treatment, and thereby escaping the probability of conflict and unjust discrimination between rival companies. It is therefore apparent that the terminal company was authorized to incorporate, and construct, own, and operate its terminal facilities in connection with the railroad lines entering the District, to satisfy a public necessity.
The employers’ liability act of 1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148), provides “that every common carrier engaged in trade or commerce in the District of Columbia, or in any Territory of the United States, or between the several States, or between any Territory and another, 'or between any Territory or Territories and any State or States, or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, shall be liable to any of its employees,” etc. With reference to the right of action under this act, its constitutionality, in so far as it applies to the District of Columbia, was upheld in Hyde v. Southern R. Co. 31 App. D. C. 466. This holding was based upon the plenary power of Congress to legislate for the District of Columbia; but, in determining whether the terminal company is a common carrier within the terms of the act, we must take into consideration the fact that it is not a line of railroad operated wholly and independently within the District of Columbia, but that it is a component part of various systems of railroad engaged, so far as it is concerned, entirely in interstate commerce. We must therefore ascertain its meaning as generally used in connection with the various acts of Congress regulating trade and commerce. The employers’ liability act is limited in its operation to employees of common carriers generally engaged in interstate commerce and *392 within the Territories and the District of Columbia. The act was passed by virtue of the power of Congress to regulate commerce between the States. Its application to the District of Columbia, in so far as granting a right of action to employees, or as applying to common carriers operating exclusively within the District, and not fonping a part of an interstate system, is not dependent upon the right of Congress to legislate under the commerce clause of the Constitution, but its power to legislate generally for the District. In determining, therefore, whether or not the Washington Terminal Company is a common carrier, no broader or different meaning can be applied to it because of its location in the District of Columbia than would be admissible if its lines extended from the District into a State, since it will be treated as forming part of an interstate system.
The power vested in Congress “to regulate commerce with foreign nations and among the several States and with the Indian tribes” (Const, art. I. sec. 8, cl. 3) is exclusive and sweeping. It is a sovereign power conferred upon the general government, which will not admit of any limitation by the States. In Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23, Chief Justice Marshall, speaking of the power of Congress to regulate commerce, said: “This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution.” It includes the power to regulate every agency of interstate commerce. In the case of railroads, the tracks, terminals, switches, stations, cars, engines, appliances, and the-methods of operation, are all, when employed as component parts of a general system, engaged in interstate traffic, instrumentalities of interstate commerce within the scope of Congressional regulation. It is therefore competent, in considering what Congress contemplated by imposing upon common carriers the burdens of the employers’ liability act, to keep in mind its general authority to include within its grasp every instrumentality that enters into interstate commerce. Such an act is clearly within the regulating power of Congress. It therefore calls for liberal construction, to the end that the intention *393 of Congress may be made effective. the power to regulate interstate commerce is so broad that under the authority of Congress rates may be established, freight classified, equipment prescribed and standardized, methods of operation enforced, and the rights of employees safeguarded. It follows that the same general rules apply to the construction and enforcement of the employers’ liability act which apply to the safety appliance act or the interstate commerce act. In Chicago, M. & St. P. R. Co. v. Voelker, 70 L.R.A. 264, 65 C. C. A. 226, 129 Fed. 522, speaking of the safety appliance act, the court said: “Obviously the purpose of this statute is the protection of the lives and limbs of men, and such statutes, when the words fairly permit, are so construed as to prevent the mischief and advance the remedy.” So with the employers’ liability act, it is for the protection of employees against the reckless and careless negligence of the fellow servant; but it possesses a broader and higher object,—to require companies engaged in the business of common carriers to exercise the highest care in the selection of their employees and in the use of approved equipment, in order that the agencies of commerce may be operated not only with the greatest degree of safety to the men employed, but that people and property may be transported without loss or injury.
This brings us to the chief proposition: Is the Washington Terminal Company a common carrier under the various acts of Congress regulating interstate commerce? If so, this company must be held to be within the operation of the employers’ liability act. In see. 1 of the interstate commerce act, as amended by the act of Congress of June 18, 1910 (36 Stat. at L. 545, chap. 309), a railroad is defined to “include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease, and shall also include all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, and also all freight depots, yards, and grounds used or necessary in the transportation or delivery of any of said property.”
*394 It will be conceded that the tracks, and station of the terminal company are used in facilitating interstate commerce. The passengers, baggage, and express moved over its tracks and through its station are in course of transportation between the District of Columbia and the States. A ticket sold by the agent •of the terminal company for one of the tenant railroad companies entitles the purchaser to a continuous passage for himself and baggage over the lines of the terminal company and the connecting lines of the tenant company. The tracks, stations, shops, roundhouses, engines, agents, and employees of the terminal company, therefore, become efficient and instrumental agencies in conducting trade and commerce in the District of Columbia, and between the District and the different States of the Union.
It is contended that the Washington Terminal Company does not own a car nor carry a passenger, and cannot therefore be held to be a common carrier. To make it a common carrier within the commerce clause of the Constitution, it is not necessary that it should own a car or carry a passenger. As we have observed, it owns a railroad and station, and, through its agents, •controls the operation of the trains over its tracks and into and out of its station. With its engines it shifts the empty cars over its tracks and makes up the outgoing trains. It is not essential that a car be loaded, to be engaged in interstate commerce. Johnson v. Southern P. Co. 196 U. S. 1, 19 L. ed. 363, 35 Sup. Ct. Rep. 158; Voelker v. Chicago, M. & St. P. R. Co. 116 Fed. 867. Neither do we think it is necessary that a railroad should actually own -ears in order to be a common carrier engaged in interstate commerce. It is sufficient if it owns and oontrols one of the instrumentalities essential in carrying on trade and commerce between different points, without the use and subjection to the control of which such trade and commerce ■cannot be conducted. Steam railroad passenger traffic entering and leaving the city of Washington is exclusively managed, ■operated, and controlled by the Washington Terminal Company while within the zone occupied by its station and tracks.
In the case of the Union Stockyards Co. v. United States, *395 94 C. C. A. 626, 169 Fed. 404, it appears that the Union Stockyards Company owns and conducts extensive stock yards at •South Omaha, Nebraska. In connection with the operation ■of the yards, it owns 35 miles of railroad track. It owns its engines, which are operated by its employees. The only cars ■owned by it are three flat cars used for hauling refuse, and one box car used as a tool storage car. All traffic destined to and from the stock yards is delivered to the stockyards company at a common point called the transfer track, where the loaded cars are turned over to the stockyards company to be hauled by its engines, under control of its employees, to the yards, pens, and sheds of the company. All outgoing freight from the yards, empty cars, and cars loaded with the products of the large packing houses immediately adjoining the stockyards, are delivered by it to the respective railroad companies at the transfer tracks. The question involved was whether the ■stockyards company was a common carrier within the provisions of the safety appliance act of Congress. Mr. Justice Van Devanter, speaking for the circuit court of appeals, said: “It must be conceded that the stockyards company would not be a common carrier, nor the property used by it a railroad, if its operations were confined to maintaining the sheds or pens, to unloading shipments thereto, to loading shipments therefrom, and to feeding, watering, caring for, and otherwise handling live stock therein. But its operations are not thus confined. On the contrary, they include the maintenance and use of railroad tracks and locomotives, the employment of a corps of operatives in that connection, and the carriage for hire over its tracks of all live stock destined to or from the sheds or pens, which, in effect, are the depot of the railroad companies for the delivery and receipt of shipments of live stock at South Omaha. The carriage of these shipments from the transfer track to the sheds or pens, and vice versa, is no less a part of their transit between their points of origin and destination than is their carriage over any other portion of the route.”
It matters not that the safety appliance act was there involved. The same rule of construction will be applied to the *396 employers’ liability act. Both derive their authority from the same source, and the general intendment of each is the same. Neither is it important that the stockyards company charged a fixed rate of $1.50 per car for hauling the cars to and from the transfer tracks, while in the case at bar a monthly rental,, based upon the proportional number of engines and cars moved, over the terminal company’s lines, is paid by the respective railroad companies for the use and service rendered by the' terminal company. The situation would not be different if the terminal company received a percentage on each passenger ticket sold, since, in the last analysis, the tenant roads in each instance are afforded the services of the tracks, engines, and employees of the terminal company for hire.
In Southern P. Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 55 L. ed. 310, 31 Sup. Ct. Rep. 279, an attempt was made to enjoin an order of the Interstate Commerce Commission requiring the appellant companies to desist from granting and giving Young, a shipper of cotton seed products, at the port of Galveston, Texas, undue preferences and advantages. The Southern Pacific Terminal Company was organized to construct and maintain wharves and docks for the accommodation of vessels, and tracks and terminal facilities for what is known as the Southern Pacific Railroad & Steamship System. It appeared that the Southern Pacific Railroad Company owned 99 per cent of the capital stock of the railroad companies whose lines centered at this terminal, and also 99 per cent of the capital stock of the terminal company. In transferring freight from the railroads to the vessels, the tracks and warehouses of the wharfage company were used, for which compensation was paid. In holding that the terminal company was a common carrier, Mr. Justice McKenna said: “We assume that the wharves in the pending case are the instruments of a common carrier. This is, however, denied, and it is asserted that the terminal company is purely a wharfage company, and ‘has no power under its charter to act as a common carrier.’ The contention is based on a partial view of the conditions. The terminal company was incorporated to execute *397 the purposes expressed in the act of the legislature of the State of Texas, that is, to construct terminal facilities for the Southern Pacific Railroad & Steamship Systems, and to accommodate the export and import traffic at Galveston; and, necessarily, as instrumentalities of such traffic, wharves and piers are as essential as steamships and railroads, and are, in fact, as they were intended to be by the charter of their authorization, parts of a system.”
Again it matters not that the Southern Pacific Railroad Company owned 99 per cent of the stock of both the terminal company and the railroads centering there. It was held to be a part of the system used for the movement of commerce. The ■case at bar is even stronger, since the Baltimore & Ohio and •the Philadelphia, Baltimore, & Washington Railroad Companies own all the stock of the Washington Terminal Company .and own all the railroad lines immediately connecting therewith. The other tenant roads of the terminal company are also tenants of these two owning companies, and compelled to connect with the lines of the terminal company over their roads.
While the cases cited differ somewhat in fact from the case .at har, there is no difference in principle. In the former case the terminal facilities furnished by the stockyards company were held to constitute a part of the means employed for the -transportation of interstate commerce to and from the South •Omaha stock yards. In the latter case the terminal tracks, wharves, docks, and piers were held to form a connecting link in the system, over which all commerce between the vessels and the centering lines of railroad must pass. In the case at bar the terminal company’s railroad and station form a part •of the system over and through which all commerce centering .at the Washington union station must pass. In each instance the agencies in question are no less common carriers, engaged in trade and commerce, than are any other parts of the tenant ■or connecting lines of railroad. If we accord to the act the liberal construction essential to make it apply to the subject sought to be regulated by Congress, we must hold that the *398 Washington Terminal Company is a common carrier within the meaning and intent of the employers’ liability act.
It is urged by counsel for plaintiff that the verdict of the jury should have been taken subject to the opinion of the court. There is great force in this contention. Rule 52 of the supreme court of the District of Columbia provides for just such an emergency as confronted the trial court in this case. No-injury nor injustice could have been inflicted upon the defendant had this course been pursued. As it is, the entire expense and delay attendant upon a new trial will again have to be incurred. No valid excuse is apparent why, in a case like-this, the rule should not be followed. Courts should be eager to avail themselves of every opportunity to facilitate the despatch of business, curtail cost, and discourage litigation, when it can be accomplished with equal justice to all concerned.
The entry of a separate judgment in favor of the Baltimore- & Ohio Railroad Company is assigned as error. We will not pass upon the propriety of the action of the court in directing-a separate verdict in its favor, and entering a judgment thereon, over the objection of plaintiff before all the evidence in the case had been submitted. It may be suggested that if the judgment in favor of the terminal company could be sustained, the-action of the court in releasing its codefendant would present a question of law, not necessary in the present state of the case to be decided, but sufficiently apparent to serve as a warning-against the further indulgence of the practice. It is impossible for us to determine what a new trial may develop touching the joint liability of the defendants, and, lest the plaintiff might be prejudiced were the judgment in favor of one of thecodefendants permitted to stand, the judgments will both be reversed, and the relation of the parties restored as it originally-existed.
Inasmuch as a new trial must be ordered, it is unnecessary to consider the other questions raised by this appeal. They may not be involved in another hearing, and, if they are, we-cannot foresee the circumstances and facts that might be before the court if again called upon to rule thereon. '
*399 The judgment on the separate verdicts is reversed, with' costs, and the cause remanded for a new trial. Reversed.
A petition for a rehearing was denied October 5, 1911.